ROBERT J. QUIGLEY, Cal. Bar No. 302879
 rquigley@ftc.gov
JOHN D. JACOBS, Cal Bar No. 134154
 jjacobs@ftc.gov
KARINA LAYUGAN, Cal Bar No. 302049
 klayugan@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300; Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

ROB BONTA
 Attorney General of California
NICKLAS A. AKERS
 Senior Assistant Attorney General
MICHELE VAN GELDEREN, Cal Bar No. 171931
 Supervising Deputy Attorney General
RACHEL A. FOODMAN, Cal Bar No. SBN 308364
 Rachel.Foodman@doj.ca.gov
LAUREL M. CARNES, Cal Bar No. SBN 285690
 Laurel.Carnes@doj.ca.gov
Deputy Attorneys General

1515 Clay Street, 20th Floor
Oakland, CA  94612-1499
Telephone: (510) 879-1300
Fax: (415) 703-5480

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION and THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br>                   Plaintiffs, <br><br>       v. <br><br> YGRENE ENERGY FUND INC., <br><br>                   Defendant. | Case No.:  2:22-CV-07864 <br><br> COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF |

Plaintiff, the Federal Trade Commission ("FTC"), and Plaintiff, the People of the State of California, through Attorney General Rob Bonta ("California") (collectively, "Plaintiffs"), for their Complaint allege:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), and the 2009 Omnibus Appropriations Act, Public Law No. 111-8, 123 Stat. 524, 678 (Mar. 11, 2009) ("Omnibus Act"), as clarified by Section 511 of the Credit Card Accountability Responsibility and Disclosure Act of 2009, Public Law No. 111-24, 123 Stat. 1734, 1763–64 (May 22, 2009) ("Credit Card Act"), and amended by Section 1097 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, 124 Stat. 1376, 2101-03 (July 21, 2010) ("Dodd-Frank Act"), 12 U.S.C. § 5538, which authorize the FTC to seek, and the Court to order, temporary, preliminary, and permanent injunctive relief, monetary relief, damages, and other relief for violations of Section 5 of the FTC Act and the Mortgage Acts and Practices – Advertising Rule, Regulation N ("MAP Rule" or "Regulation N"), 12 C.F.R. Part 1014.

2. Plaintiff California brings this action under California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.*, and California's False Advertising Law, Business and Professions Code § 17500, *et seq.*, which authorize the Court to order civil penalties, injunctive relief, restitution, and other equitable relief.

## SUMMARY OF CASE

3. Plaintiffs allege that Defendant Ygrene Energy Fund Inc. ("Ygrene") has engaged in unfair and deceptive acts and practices in connection with Ygrene's marketing and sale of Property Assessed Clean Energy ("PACE") financing to consumer homeowners. PACE financing for homeowners (or "residential PACE") is a relatively new and unique form of financing that is available in parts of California, Florida, and Missouri for certain energy-related home-improvement projects, such as the installation of solar panels, and for projects designed to

increase disaster resiliency, such as adding storm windows in areas susceptible to hurricanes.

4.     One of the unique aspects of residential PACE financing is its connection to property taxes.  When a consumer receives a PACE loan from Ygrene, a first-position lien ("PACE lien") is recorded against the consumer's property to secure the PACE loan, and the homeowner is billed for and pays installments on the PACE loan through his or her property tax bill.

5.     As described below, Ygrene deceptively represents to consumers that its financing will not create any obstacles to, or interfere with, consumers' ability to sell or refinance their homes, and that the payment obligation on the PACE loan will transfer to the next owner if the consumer sells his or her home.  Ygrene has made these representations to consumers directly and also makes them through a network of home-improvement contractors whom Ygrene has authorized to solicit customers.  In reality, there is a significant likelihood that consumers will have to pay off any PACE loan that they receive from Ygrene before they can sell or refinance their homes.  Lenders commonly refuse to issue a new mortgage loan, or to refinance an existing loan, unless the homeowner first pays off the outstanding balance of the PACE loan.  This is because the lien that results from a PACE loan typically has higher priority than a mortgage lien, and because the largest purchasers of mortgages on the secondary market, Fannie Mae and Freddie Mac, are prohibited by the Federal Housing Finance Agency from purchasing mortgages on homes that are subject to a PACE lien.

6.     Plaintiffs further allege that, in numerous instances, Ygrene fails to obtain consumers' express, informed consent to using the consumer's home as collateral to secure Ygrene's loan.  This unfair failure to obtain express, informed consent arises from Ygrene's use of home-improvement contractors who market and sell their services, together with Ygrene's PACE financing, door to door.  In numerous instances, the contractor causes Ygrene to send its form finance

agreement to an email address controlled by the contractor rather than the consumer. The contractor, rather than the consumer, then "e-signs" the contract in the space for the consumer's signature, without the consumer's authorization, tantamount to forging the consumer's signature. In other instances, while standing at the consumer's side, these contractors pressure consumers to electronically sign Ygrene's finance agreement, or rush them through the process, interfering with the consumer's opportunity to review the terms. Additionally, in numerous instances, the consumers harmed by these unfair acts and practices, and the deceptive acts and practices alleged in Paragraph 5, have spoken Spanish as their primary language.

7.     Ygrene's unfair and deceptive acts and practices have injured and continue to injure consumers, interfering with consumers' ability to sell and to refinance their homes, and subjecting consumers to substantial, unexpected expenses and personal hardship.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and under Section 626 of the Omnibus Act, as clarified by Section 511 of the Credit Card Act and amended by Section 1097 of the Dodd-Frank Act, 12 U.S.C. § 5538, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2), (c)(2), (d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFFS

10.     The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. Pursuant to the Omnibus Act, § 626, as

clarified by the Credit Card Act, § 511, the FTC promulgated the MAP Rule, 16 C.F.R. Part 321, effective August 19, 2011, which among other things prohibits misleading or deceptive commercial communications relating to "mortgage credit products," as defined by the Rule.  On December 16, 2011, the MAP Rule was recodified as 12 C.F.R. Part 1014, effective December 30, 2011, as an Interim Final Rule, and on April 28, 2016 as a Final Rule, designated as the "Mortgage Acts and Practices – Advertising Rule, Regulation N."  Pursuant to the Dodd-Frank Act, § 1097, the FTC retains authority to enforce Regulation N.  Further, the FTC is authorized to use all of its functions and powers under the FTC Act to enforce compliance with Regulation N, including Section 19 of the Act, 15 U.S.C. § 57b.

11.    The People of the State of California bring this action by and through Attorney General Rob Bonta, who is authorized by California Business and Professions Code §§ 17535 and 17536 to enforce the California False Advertising Law, California Business and Professions Code § 17500 *et seq.*, and authorized by California Business and Professions Code §§ 17203, 17204, and 17206 to enforce the California Unfair Competition Law, California Business and Professions Code § 17200 *et seq*.

**DEFENDANT**

12.    Defendant Ygrene Energy Fund Inc. ("Ygrene") is a Delaware corporation with its principal place of business at 2100 South McDowell Boulevard, Petaluma, California 94594.  Ygrene transacts or has transacted business in this district and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Ygrene has advertised, marketed, distributed, or sold residential PACE financing to consumers throughout the United States.  Ygrene is a "person" as defined by Regulation N, 12 C.F.R. § 1014.2.

**COMMERCE**

13.     At all times relevant to this Complaint, Ygrene has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANT'S BUSINESS PRACTICES**

**Overview of PACE Financing and Ygrene's Role as Administrator**

14.     PACE is a relatively new system of residential financing available in three states—California, Florida, and Missouri—to encourage private investment in residential property improvements that further public purposes such as increasing reliance on renewable energy, improving energy efficiency or water conservation, and improving disaster resiliency.  Ygrene has marketed and sold PACE financing to consumers in California and Florida beginning in or about 2015, and to consumers in Missouri beginning in or about mid-2017.

15.     In line with these purposes, residential PACE financing can be used only for certain home-improvement projects—e.g., adding solar panels, energy-efficient roofs or ventilation systems, and, in Florida, hurricane-protection measures such as storm windows and doors.

16.     The state laws that authorize residential PACE financing in California, Florida, and Missouri allow local governmental bodies, such as cities or counties, or special tax districts formed by these bodies, to establish local PACE programs. Residential PACE financing is available only to residential property owners in those local areas and tax districts that have implemented PACE programs.

17.     In all instances relevant to this Complaint, the administration of PACE financing programs has been contractually delegated by the bodies described in Paragraph 16 to private, for-profit businesses like Ygrene.

18.     Ygrene, like other PACE administrators, underwrites, funds and services all the PACE loans that it administers, and conducts all advertising and marketing of its PACE financing programs.

19.     The average residential project that Ygrene has funded costs about $20,000; many projects that Ygrene has funded cost $40,000 or more.  Since 2015, Ygrene has provided more than $1.5 billion in PACE financing for over 75,000 residential projects.

20.      As described in more detail below, after receiving and approving a prospective customer's application for a PACE loan from Ygrene, Ygrene presents the consumer with a form finance agreement.  Ygrene's finance agreement is at least 10 pages in length and is written in small print.  Pursuant to the agreement, consumers are required to repay the amount of the cost of the home-improvement project, together with origination fees and interest, over a period of 5 to 30 years, most frequently 20 years.  Ygrene has generally charged an interest rate of between approximately 7% and 8.5% on its financing.

21.     For PACE financing that Ygrene originated prior to November 2018, Ygrene's finance agreements require the consumer to pay a substantial "prepayment penalty" or "prepayment premium" if they pay off Ygrene's PACE financing at any point before the end of the financing term.  Typically, these prepayment penalties amount to 5% of the outstanding principal balance regardless of when it is paid off.

22.     Since November 2018, Ygrene has not subjected any of its newly originated PACE financing to prepayment penalties.  However, Ygrene continues to impose prepayment penalties against consumers who were signed up for Ygrene's PACE financing prior to November 2018.

23.     Once a consumer's finance agreement is accepted, Ygrene directs the local governmental body in whose jurisdiction it is operating to place and record a special tax assessment lien against the consumer's residential property.  Upon recording a lien against a consumer's property for a Ygrene-issued PACE loan, the local governmental body promptly assigns to Ygrene its rights and interests under the finance agreement, including all associated tax revenues.

24.     The dollar amount of these liens includes the total amount of financing that was provided pursuant to the PACE loan, as well as interest payments to be made over the term of the loan.

25.     Ygrene's "PACE liens" are treated the same as tax liens under the laws of the states in which Ygrene operates.  This allows PACE liens to take a first lien or "super-priority" lien status over existing primary mortgages and most other liens.  As a result, as discussed further below, these PACE liens present a significant obstacle to the consumer's ability to obtain refinancing or to sell their home.

26.     The homeowner's obligation to repay the PACE loan, including fees and interest, is divided up into annual or biannual amortized installment payments. Instead of receiving monthly billing statements, consumers are billed for and make payments on their Ygrene PACE loans through their property tax bills.  A "special tax" is added to the homeowner's property tax bill, as a line-item entry, every year for the term of the loan or until the lien is paid off, in an amount corresponding to the annual or biannual amortized installment payment due on the financing.  As noted above, all revenues from this "special tax" belong to Ygrene, not the local taxing authority.

27.     Failure to pay the required PACE installments subjects consumers to the same consequences they face for any other default on their property taxes, including the possibility of foreclosure.  PACE uniquely allows private businesses such as Ygrene to wield public tax assessment liens to secure private loans.

28.     PACE is unlike traditional home-improvement financing.  Consumers do not receive credit disclosures from Ygrene that they may be accustomed to receiving with traditional loans before they make the decision to agree to this new form of financing.

29.     Ygrene's residential PACE financing is a "mortgage credit product" subject to Regulation N.  Regulation N defines "mortgage credit product" as "any

form of credit that is secured by real property or a dwelling and that is offered or extended to a consumer primarily for personal, family, or household purposes." 12 C.F.R. § 1014.2.

30.     As described herein, Ygrene has advertised, marketed, and sold its residential PACE financing, a "mortgage credit product," in "commercial communications." Regulation N defines "commercial communication" as "any written or oral statement, illustration, or depiction, whether in English or any other language, that is designed to effect a sale or create interest in purchasing goods or services," regardless of medium, and including scripts and training materials for oral presentations and sales pitches. 12 C.F.R. §1014.2.

## Ygrene's Use of Contractors to Sell Its Financing

31.     Ygrene uses various means to advertise its financing (e.g., direct mail, television and radio ads, and its website). The primary way Ygrene markets and sells its PACE financing to consumers, however, is through its network of thousands of home-improvement contractors, as discussed further below. A Ygrene-commissioned survey indicated that 60% of its customers learned about its financing from a Ygrene-affiliated home-improvement contractor.

32.     Thus, Ygrene employs a system that, in many instances, relies on home-improvement contractors, such as solar-panel installers, to explain and sign consumers up for its novel and complex PACE financing. The contractors, in most instances, serve as consumers' primary source of information about the Ygrene loan.

33.     Ygrene has armed its authorized contractors with misleading information that conveys, among other things, that its PACE financing will transfer to a new owner upon a home sale and will not impede their ability to sell or refinance their home. Further, Ygrene fails to properly train, and to meaningfully oversee, the contractors it has authorized to sell its financing. The door-to-door

sales process, which many of the home-improvement contractors employ to sell Ygrene's financing, lacks sufficient safeguards to ensure that contractors are not deceiving consumers or exerting undue pressure on consumers to enter into this complex financial transaction.

34.     Since launching its residential PACE program, Ygrene has received hundreds of complaints about dishonest conduct and misleading representations by its authorized contractors.  Notwithstanding these complaints, Ygrene has not changed its practice of relying on contractors to explain and sell its PACE financing to consumers, nor has it implemented adequate fraud-prevention measures.  In fact, Ygrene has continued to rely on many contractors that have been the subject of numerous complaints.

*Recruiting Contractors to Become Ygrene-Affiliated*

35.     Ygrene employees known as "Regional Account Managers," or "RAMs," recruit contractors to join the ranks of Ygrene's authorized contractors. Only contractors who have been authorized by Ygrene are allowed to market and sell Ygrene's PACE financing.

36.     RAMs are part of Ygrene's sales department.  Each RAM is typically responsible for managing dozens of contractor accounts, and for training and supervising those contractors.  A RAM's performance and commissions are based primarily on the number of PACE financing applications their contractors generate as well as the total dollar amount of PACE loans that are funded for these contractors' projects.

37.     Ygrene has recruited contractors to market its PACE financing by claiming that its "no-money down" financing and fast approval process are attractive to consumers and will help them close on construction projects.  For example, one promotional document Ygrene has provided prospective contractors claims customers will be approved for financing in "15 Minutes or Less" and that contractors can expect to "[c]lose your customers at the kitchen table."

38.    Since 2012, Ygrene has authorized more than 4,000 home-improvement contractors to market and sell its PACE financing, more than 2,000 of whom are currently active and in good standing with Ygrene.

*Training Ygrene's Contractors*

39.    Ygrene's RAMs are responsible for training its newly authorized contractors on how to market its PACE financing to consumers. RAMs serve as the primary point of contact between Ygrene and its authorized contractors.

40.    The initial training that Ygrene provides its contractors typically lasts between 60-90 minutes. This training primarily consists of going through a PowerPoint presentation. Ygrene also provides contractors during this training with tools to use in soliciting and signing consumers up for Ygrene financing.

41.    Ygrene's PowerPoint presentation includes basic information about PACE financing and provides selling points for contractors to use when pitching Ygrene financing to consumers.

42.    Ygrene's training on what will happen when a homeowner with a PACE loan wants to sell or refinance his or her home has contained misleading information, which contractors in turn have passed on to consumers, as discussed further below.  In numerous instances, Ygrene has represented to contractors that its financing is "transferable" and/or that the balance of its PACE financing will transfer to the new owner upon the sale of their home. Ygrene has further directed its contractors in its training presentations to use "transferability" as a distinct selling point in pitching Ygrene's PACE financing to consumers, as an advantage over other forms of financing.

43.    For example, a Ygrene slide titled "What to Say?" from a 2015 contractor training PowerPoint presentation states: "The financing is attached to your property, so if you sell the home the cost of the financing will transfer to the buyer, who will continue to enjoy the benefits and savings of the improvements."

-11-

44.     A slide from a different 2015 contractor training presentation provides another example of Ygrene conveying transferability as a selling point.  Among six selling points for Ygrene's financing, this slide makes the point that "Payments Stay with the Property":



45.     As another example, the following statement appears in an early 2016 training slide that lists five reasons why Ygrene's PACE financing is "America's Best Financing":

5   Lien Transferability – When the Property is Sold, the Lien can Transfer to New Buyers

46.     Another training slide in the same 2016 presentation that describes eleven "Product Benefits" for Ygrene's PACE financing includes the following

statement:  "In CA Line Item Mello Roos Tax Transferable with Property."

47.    In addition, as of August 30, 2016, Ygrene's "Sales and Operations Playbook," which Ygrene provided to the RAMs for the purpose of training contractors, also conveys to RAMs that the transferability of Ygrene's PACE loans is a benefit that should be touted when training contractors.  This presentation includes the following in a list of talking points to be used to convince contractors to "put Ygrene into first position" over other financing options that are available to consumers:

> "Ygrene has many benefits over other financing options that matter to your customer . . . . Loan may stay with property upon transfer, especially with Ygrene's SB 555 program, since the assessment is a Mello-Roos special tax."

(Emphasis in original).

48.    Ygrene has trained many of its authorized contractors using these training materials, which emphasize transferability as a selling point.  For example, between Ygrene's inception and August 30, 2016, which is the date of the RAM talking points referenced in the preceding paragraph, Ygrene enrolled and trained more than 2,200 contractors, who are collectively responsible for more than $1.2 billion in home-improvement projects funded by Ygrene.  More than 1,000 of these contractors continue to be active and in good standing with Ygrene.

49.    Ygrene has revised its contractor training materials from time to time.  However, as of approximately late 2018 (even after Ygrene had purportedly reformed its training due to heightened regulatory scrutiny—see Paragraph 56 below), Ygrene still trained its authorized contractors to make in-home sales pitches that misleadingly and incompletely explain the significant consequences of using this new form of home-improvement financing.  Importantly, Ygrene failed to train contractors to clearly and conspicuously disclose to consumers that Ygrene's financing is secured by a lien recorded on their property; that mortgage

lenders, as a pre-condition to originating or refinancing a mortgage, require in numerous instances that the PACE lien first be removed; or that, because of this requirement, consumers could face significant delay in selling their homes or obtaining refinancing.

50.     During the training, in addition to going through its PowerPoint presentation, Ygrene provides contractors with tools for directly marketing Ygrene's financing and guiding consumers through the application process.

51.     For example, Ygrene provides contractors with a Ygrene-branded online contractor portal accessible through mobile devices such as smartphones or tablets.  Ygrene markets its "contractor portal" as easy-to-use, for example, by stating on Apple's App Store: "You [the contractor] can check eligibility, create proposals, complete and submit applications, and manage your projects — all with the tap of your finger."

52.     Ygrene also provides to contractors a list that Ygrene maintains of consumers who may be eligible for Ygrene's financing, which contractors may use for identifying potential targets of their sales efforts.

53.     In many instances, during the initial training, RAMs have also provided contractors with an explanatory video developed by Ygrene, entitled "How it Works," so that contractors can show it to potential customers during their in-home sales presentations.  This video, as discussed in more detail further below, contains misleading statements regarding the ability to transfer Ygrene's PACE financing to the new owner upon a sale of the property.

54.     During training, Ygrene has encouraged its authorized contractors to personally "assist" consumers in completing applications, as a way to receive their payment more quickly.  For example, one mid-2015 contractor training presentation stated that contractors should "[a]ssist property owner with signing the UAA (financing agreement) while you are there at the kitchen table.  Once the UAA is DocUsigned our Notice to Proceed (NTP) is issued to you (the contractor)

immediately." An April 2017 Ygrene training presentation directed towards Ygrene's RAMs stated, "Primary item to embed into the contractor's process is to stay at the property until the finance documents are signed by the property owner."

55.    On occasion, RAMs supplement a contractor's initial training during in-person meetings, based on further guidance from Ygrene's sales department.

56.    In November 2018, due to additional regulations of PACE that were soon to take effect in California, Ygrene began requiring contractors in California to complete supplemental training and more extensive introductory training.

*Ygrene Holds Out its Authorized Contractors as its Agents*

57.    Ygrene holds out its authorized contractors to consumers as agents for Ygrene's PACE financing program. For example, until late 2018, Ygrene referred to the contractors who it authorizes to market and sell its PACE financing as "Ygrene Certified Contractors," and encouraged these contractors to place "Ygrene Certified" logos on their marketing materials.

58.    Ygrene also assures consumers that it screens, trains, and oversees these contractors. For example, a brochure that Ygrene distributed to consumers in late 2016 stated, in relevant part:



**CERTIFIED**

service and quality comes built in

Want to find a great contractor that can offer you the best financing available? Make sure they're Ygrene Certified. We've registered, trained and certified only the best building and trade professionals in your community. That's right. Ygrene Certified means licensed, bonded, and insured. But we don't stop there.

We also provide continuing education to ensure all contractors remain qualified to represent YgreneWorks and provide outstanding service. And only Ygrene Certified Contractors can offer the most flexible terms, extended payment options and unparalleled tax benefits.

59.     Ygrene has further encouraged consumers to view its authorized contractors as Ygrene's agents by providing these contractors with Ygrene-branded materials to distribute to consumers.  For example, Ygrene has provided contractors with Ygrene-branded baseball caps, polo shirts, pens, stickers, and USB Flash drives, as well as marketing brochures and tabletop displays.

60.     Ygrene additionally invites its authorized contractors to "co-market" their services by disseminating advertisements that refer to the contractors' status as certified or approved Ygrene contractors, that refer to having been vetted or trained by Ygrene to attain the certification, and/or that refer to Ygrene's PACE financing as an option to pay for the contractors' services.

*Contractors' Door-to-Door Sales of Ygrene's PACE Financing*

61.     Many of Ygrene's authorized contractors solicit business by going door to door.  In numerous instances, these cold-call sales pitches are made to consumers who have not sought out the contractor's services and have not researched ways to finance home construction projects.

62.     While physically present at a consumer's home, these contractors pitch Ygrene's financing to cover the costs of home-improvement projects while at the same time pitching their contracting services to perform the work.

63.     When pitching Ygrene's PACE financing to consumers, Ygrene's authorized contractors use information, talking points, materials, and tools they have received from Ygrene, as Ygrene has trained them to do.

64.     For example, in numerous instances during in-home sales pitches, contractors use Ygrene-branded promotional materials, Ygrene's online "Contractor Portal," and Ygrene's "Contractor Portal" application.  In addition, in numerous instances, Ygrene's authorized contractors amplify, embellish, modify, or add to the talking points that they receive from Ygrene.

**Ygrene Misrepresents the Effects of its PACE Loans on the Ability of Consumers to Sell or Refinance Their Homes**

65.    Ygrene has misled consumers and continues to mislead consumers about the effect that PACE financing has on consumers' ability to sell or refinance their homes through its affirmative misrepresentations.  Ygrene has made these misrepresentations to consumers directly, either expressly or by implication.  Ygrene has also explicitly or implicitly instructed its contractors to convey these representations to consumers and has condoned such representations.

*Ygrene's Representations*

66.    Ygrene makes the following representations to consumers—either directly or through its authorized contractors—about the consequences of Ygrene's PACE financing in relation to consumers' ability to sell or refinance their homes:

    a.    Upon sale, consumers with PACE loans from Ygrene will be able to simply transfer the lien or any outstanding balance on the PACE loan to the new owner and will not have to first pay off the remaining balance of the PACE loan; and

    b.    Ygrene's PACE financing will not create any obstacles to, or interfere with, consumers' ability to sell or refinance their homes.

As discussed below, these representations are false and misleading and lack prior substantiation.

67.    Ygrene has made these representations to consumers through a number of channels, including online media, its website, and printed brochures, mailers, and its authorized contractors.

68.    For example, Ygrene's "How It Works" video, discussed above, has conveyed these representations.  Ygrene has provided this video to contractors for use in sales pitches and made this video available on its public website.  Ygrene has distributed a number of different versions of this video over time, some of which have included materially misleading statements and misrepresentations

-17-

about Ygrene's PACE financing.  These videos state, for example, that the consumer's payments transfer to the new owner, or may transfer, "just like your property tax," and that, because of this, "you only pay for what you use."

      a.    Through at least early 2016, the "How It Works" video stated in a voiceover:

          "If you sell your property, the payments transfer to the new owners, just like your property tax, so you only pay for what you use. . . .  It's as if your house is borrowing the money, not you personally.  As a result, we don't need to look at your credit score, verify your employment, or review your financial statements."

      b.    Subsequent versions of Ygrene's "How It Works" video have stated that "payments may transfer to the new owner, just like your property tax, so you only pay for what you use."

69.    In numerous instances, Ygrene's contractors and Ygrene employees have made these representations to consumers, at Ygrene's direction.  For example, in accordance with Ygrene's instructions in the earlier years of its business through at least mid-2016, Ygrene's contractors and members of Ygrene's own internal sales organization referred to Ygrene's PACE financing as "transferable."  They also told consumers that their payment obligation would "transfer" or "stay with the property" when they sold or refinanced their homes, or otherwise conveyed affirmatively that Ygrene's PACE financing would not pose an obstacle to selling or refinancing.

*Ygrene's Representations are Misleading*

70.    Contrary to Ygrene's representations, in numerous instances, consumers who have Ygrene's PACE financing face significant obstacles in selling or refinancing their homes; are not able to simply transfer the remaining balance on the PACE loans to the new buyer; and are not able to sell or refinance their homes unless they first pay off the outstanding balance of their PACE loan.  Many Ygrene

-18-

customers do not learn until they try to sell or refinance their homes that mortgage lenders require Ygrene's PACE lien to be removed before the existing mortgage can be refinanced or a new loan will be issued.  In these instances, in order to complete the transaction, the consumer has to pay off the Ygrene loan, including, in many instances, steep prepayment penalties.

71.     The likelihood that consumers will have to pay off their PACE liens before selling or refinancing their homes is a function of the significant risk faced by mortgage lenders that is associated with underwriting a loan against a property that is encumbered by an existing PACE lien.  Mortgage lenders face the additional risk that they will not be able to sell such mortgages on the secondary market, as the largest purchasers of mortgages are not permitted to purchase a mortgage if the property is encumbered by a PACE lien.

72.     The largest purchasers of mortgages on the secondary market are the government-sponsored enterprises commonly known as "Fannie Mae" (the Federal National Mortgage Association) and "Freddie Mac" (the Federal Home Loan Mortgage Corporation).  Fannie Mae and Freddie Mac together have purchased about half of all outstanding single-family mortgages in the United States.  Fannie May and Freddie Mac are regulated by the Federal Housing Finance Agency ("FHFA"), which is an independent federal agency that supervises, regulates, and serves as the conservator of, Fannie Mae and Freddie Mac.

73.     Since 2010, FHFA has directed Fannie Mae and Freddie Mac to undertake a number of "prudential actions" with regard to mortgages on properties with PACE liens, noting that these first liens raise "significant safety and soundness concerns" and that they "present significant risk to lenders and secondary market entities."  Fed. Housing Finance Agency, *FHFA Statement on Certain Energy Retrofit Loan Programs* (July 6, 2010), https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Statement-on-Certain-Energy-Retrofit-Loan-Programs.aspx (last visited Sept. 7, 2022).

74.     On December 22, 2014, the FHFA issued a further policy statement, which remains in effect, confirming that:

        a.      "Fannie Mae and Freddie Mac's policies prohibit the purchase of a mortgage where the property has a first-lien PACE loan attached to it";

        b.      "[A] homeowner with a first-lien PACE loan cannot refinance their existing mortgage with a Fannie Mae or Freddie Mac mortgage"; and

        c.      "[A]nyone wanting to buy a home that already has a first-lien PACE loan cannot use a Fannie Mae or Freddie Mac loan for the purchase."

Fed. Housing Finance Agency, *Statement of the Federal Housing Finance Agency on Certain Super-Priority Liens* (Dec. 22, 2014), https://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-of-the-Federal-Housing-Finance-Agency-on-Certain-Super-Priority-Liens.aspx (last visited Sept. 7, 2022).

75.     At all times relevant to this Complaint, Fannie Mae and Freddie Mac have in fact refused to purchase mortgages on properties subject to first-lien PACE loans like Ygrene's.  Failure on the part of a lender in the primary mortgage market to require the removal of the PACE lien, therefore, forecloses the possibility of selling the mortgage to Fannie Mae or Freddie Mac.

76.     In light of the FHFA policy against purchasing mortgages on properties subject to PACE liens, many lenders require that PACE financing be paid off in full, and that PACE liens be removed, before they will underwrite a new mortgage against the property.

77.     The policies and practices of mortgage lenders as described above significantly affect the ability of consumers with a PACE loan to sell or refinance their homes.  In 2019, the Mortgage Bankers Association, a trade organization that

represents many of the nation's largest mortgage lenders, stated in a rulemaking

proceeding before the Consumer Financial Protection Bureau that, due in part to

the FHFA policy, "In reality, most PACE assessments must be paid off before the

property is sold," and "[m]ost PACE borrowers will need to pay-off the PACE

assessment before they are able to refinance their mortgage loans."

Regulations.gov, *Comment Submitted by Mortgage Bankrs Assoc. to CFPB on*

*Proposed Rulemaking for PACE Financing* (May 7, 2019),

https://www.regulations.gov/comment/CFPB-2019-0011-0082 (last visited Sept. 7,

2022).

78.    Ygrene's representations that the remaining payments on a

consumer's PACE loan will transfer to the purchaser upon sale of the consumer's

house, and that its PACE financing will not create any obstacles to, or interfere

with, consumers' ability to sell or refinance their homes, are false, and Ygrene has

lacked substantiation for these representations at the times Ygrene has made them

or caused them to be made.

**Ygrene's Failure to Obtain Consumers' Express, Informed Consent**

79.    After funding a PACE loan for a consumer's property, Ygrene causes

the consumer's home to be used as collateral to secure the PACE loan, by causing

a lien to be recorded against the consumer's property.

80.    In numerous instances involving solicitation of Ygrene customers by

Ygrene's authorized contractors, Ygrene causes the homes of consumers to be used

as collateral to secure Ygrene's PACE loans without having obtained the

consumer's express, informed consent.

81.    As explained below, in many of these instances involving contractor

solicitations, Ygrene receives an electronic signature on a finance agreement that

purports to reflect the consumer's consent to the imposition of a lien, but which in

fact was neither made nor authorized by the consumer, but instead by the

contractor.  The forged or unauthorized signatures in such instances do not

constitute the consumer's express, informed consent to any of the terms of the agreement.

82.     In other instances, consumers sign a lengthy, small-print finance agreement that may make reference to a lien, but the consumer does not see or understand such references because they are insufficiently clear or conspicuous, and/or because Ygrene's authorized contractor engages in conduct that leads the consumer to skip over or misunderstand such references.  For example, in some cases, the contractor: misrepresents to the consumer that the agreement merely says what the contractor already told the consumer; represents that the consumer does not need to read the agreement; and/or rushes the consumer through the electronic signing of the finance agreement, which is often presented to the consumer on a mobile phone or handheld tablet device—in many cases owned by the contractor—with a small screen that adds difficulty to navigating and understanding the agreement.

83.     Additionally, as explained below, any efforts Ygrene might take after Ygrene obtains what appears to be a consumer's signature on a finance agreement have also failed to ensure that the consumer has provided his or her express, informed consent to using the consumer's home as collateral to secure a loan from Ygrene.  For example, in or around 2017, Ygrene purportedly began making telephone calls to consumers after receipt of signed finance agreements to discuss with the consumer various terms of Ygrene's financing.  However, to the extent Ygrene has made such calls, the calls have failed to ensure or evidence that the consumer has provided his or her express, informed consent to using the consumer's home as collateral because, in numerous instances: (1) Ygrene fails to clearly state during such calls that the consumer's home is being used as collateral; and/or (2) the person to whom Ygrene speaks is not actually the consumer but rather the consumer's contractor, impersonating the consumer during the call.

*Applying for Ygrene financing in sales involving authorized contractors*

84.     Ygrene requires an application for its PACE financing to be submitted to confirm a consumer's eligibility for financing before Ygrene will send out a finance agreement for the consumer's signature.  Ygrene accepts applications that are filled out and submitted through Ygrene's website and through Ygrene's contractor portal, as well as applications that are made over the phone.

85.     In sales of Ygrene financing that are initiated by authorized contractors, the application is typically submitted to Ygrene immediately following the contactor's in-home sales pitch while the contractor is still present in the consumer's home.

86.     In many instances, it is the contractor's representative, rather than the consumer, who fills out the consumer's application and submits it to Ygrene.  In some of these instances, the contractor representative submits the application on a consumer's behalf without informing the consumer they are applying for financing. In other instances, in accordance with Ygrene's training, the contractor representative ushers the consumer through the application quickly, often using a mobile device owned by the contractor, such as an iPad, such that the consumer is discouraged or inhibited from thoroughly reading the application or any documents that might be hyperlinked.

87.     Ygrene's application requires an email address for the consumer, which will be used by Ygrene to send out its form finance agreement upon Ygrene's approval of the application.  In numerous instances when a contractor representative fills out the application form for the consumer, the contractor representative puts down an email address controlled by the contractor representative, rather than an email address belonging to the consumer.

88.     According to selling points that Ygrene has provided to contractors, Ygrene makes its approval decisions in a matter of minutes.  Ygrene's application-review process primarily consists of determining whether the property owner has

available equity, whether the owner is current on his or her property tax and mortgage payments, and whether the owner is in bankruptcy. Prior to 2018, Ygrene's underwriting process did not take into account the consumer's ability to repay the PACE financing it issued. Ygrene's underwriting criteria, therefore, were not designed to screen out consumers who could not afford the financing payments. In 2018, a California regulation went into effect that required Ygrene to consider a consumer's ability to repay the financing as part of its underwriting process. Ygrene's PACE originations in California in the first half of 2018 plunged by nearly 50% in comparison to same period in 2017. Ygrene has stated that it did not consider consumers' ability to repay as part of its underwriting process for consumers in Florida and Missouri until at least mid-2019, when Ygrene claims to have implemented a limited form of ability-to-repay analysis.

*Completing and Submitting Ygrene's Finance Agreement*

89.     After Ygrene approves a consumer's application for financing, it causes DocuSign, an electronic signature service, to send an email to the email address provided on the consumer's financing application. This DocuSign email includes a hyperlink to the Ygrene finance agreement. The finance agreement is pre-populated with the consumer's name and other information taken from the consumer's application.

90.     As noted above, in many instances contractor representatives put down on the Ygrene application an email address controlled by the representative rather than the consumer. Thus, in those instances the finance agreement is sent to the contractor representative, not the consumer, opening the opportunity for fraud or impersonation of the consumer by the contractor.

91.     In many instances, the contractor representative does not show the email or the finance agreement to the consumer, but instead electronically signs the agreement and submits it to Ygrene under the consumer's name without his or her knowledge or authorization. Thus, in these instances, Ygrene has not received the

consumer's express, informed consent to the terms of Ygrene's financing or the use of the consumer's home as collateral to secure the loan.

92.     In numerous other instances when a contractor's email address has been listed on Ygrene's finance application, the contractor representative receives Ygrene's DocuSign email on the representative's tablet or laptop, while still in the consumer's home, and then shows the finance agreement to the consumer.  In such cases the consumer is presented with the agreement on the contractor's device, in the presence of the contractor representative.

93.     If the DocuSign email is sent to an email address that belongs to the consumer, consumers in numerous instances receive the email and open up the finance agreement on the consumer's mobile phone or tablet or on the contractor's electronic device.  In numerous instances the contractor representative is still with the consumer when the consumer receives and opens the DocuSign email with Ygrene's finance agreement.

94.     Ygrene's finance agreement currently consists of two main parts: (1) a "Financing Estimate and Disclosures," and (2) a "Financing Agreement." Prior to approximately December 2016, Ygrene did not include the "Financing Estimate and Disclosures."  Unless otherwise noted, the term "finance agreement" as used in this Complaint refers to both of these documents.

     a.     The "Financing Estimate and Disclosures" provides basic information relating to the cost of financing.  It typically has consisted of approximately three pages.  Most of the document is written in a small font, such as 8 point.

     b.     Ygrene's "Financing Agreement" has typically consisted of at least 12 pages, including approximately seven pages of contract terms.  Like the Financing Estimate and Disclosures, most of the document is written in a small font, such as 8 point.

-25-

95.     As described above, in numerous instances involving Ygrene's authorized contractors, consumers review Ygrene's small-print finance agreement on a mobile phone or on a handheld tablet device, adding to the difficulty of reading a lengthy agreement with small-print disclosures.

96.     Ygrene's authorized contractors take advantage of the electronic signing process to rush consumers into signing the finance agreement. To sign Ygrene's finance agreement using DocuSign, the recipient of Ygrene's DocuSign email—either the consumer or the contractor representative—opens the agreement on an electronic device. Once the recipient starts the signature process, the screen jumps to the first spot where initials or a signature is required, which is highlighted. This interface allows the entire lengthy agreement to be fully executed in a matter of minutes, if not seconds.

97.     In many instances, contractors pressure consumers to quickly click through the electronic-signing process without providing the consumer time to review the terms of the agreement. In other instances, contactors or their representatives assure consumers that the document merely memorializes the terms that the contractor shared orally during the sales pitch. After the consumer electronically signs Ygrene's finance agreement using DocuSign, the agreement is submitted to Ygrene electronically.

98.     Ygrene's combined sales and sign-up processes have been insufficient to prevent forgery and to ensure that consumers understand that their homes are used as collateral to secure the loan from Ygrene. In numerous instances, consumers whose home improvement projects are funded by Ygrene do not know at the time the projects are funded that a lien will be recorded against their property or that their homes will be used to secure Ygrene's loan.

## Ygrene's Deceptive Representations and Unfair Conduct
## Cause Significant Consumer Harm

99.     In numerous instances, the unexpected need to pay off Ygrene's

-26-

financing in its entirety in order to complete a home sale or refinancing has caused consumers significant monetary injury and other harm.  Consumers frequently face tight deadlines to complete these transactions and do not learn of the need to pay off the balance of their PACE loans, or even the existence of a lien, until they begin the sale or refinance process.  In some instances, the home sale or refinancing falls through as a result, or it is significantly delayed because of the time it takes for the taxing authority to officially remove the lien from the public record after it has been paid in full.  In other instances, consumers are surprised when they learn they have to pay off the entire outstanding lien balance because of Ygrene's representations that the consumer will "only pay for what you use."

100.    Further, as discussed above, Ygrene has required numerous consumers to pay substantial prepayment penalties as a condition of removing the PACE lien.  Typically, consumers have been required to pay a penalty equal to five percent of the outstanding principal balance of the financing—frequently, $1,000 or more, even if consumers have already made several years of timely payments on their financing.

101.    Additionally, consumers have been forced to incur additional unanticipated expenses related to the early payoff of Ygrene's financing.  For example, until January 2019, a third-party servicing company that Ygrene engaged required consumers to pay a fee of $50 or $100 simply to learn the outstanding balance on the financing that they would need to pay off in order for the lien to be released.  But for the unexpected need to pay off Ygrene's financing in order to sell or refinance their homes, consumers would have been able to avoid these additional fees or expenses.

### Ygrene Knew or Should Have Known About
### Consumers' Lack of Consent and the Misrepresentations

102.    Ygrene has been made aware by various means that the electronic signatures that it receives on its finance agreement cannot be trusted to belong to

-27-

the consumer whose name is on the agreement.  For example, Ygrene has received numerous consumer complaints stating that the consumer did not e-sign Ygrene's finance agreement, and/or that the email address Ygrene has on file for the consumer—the address to which Ygrene sent its finance agreement—does not belong to the consumer.  In following up on consumer complaints, and in speaking with contractors, Ygrene has also been made aware that contractors provide their own email addresses, instead of the email addresses of consumers, on finance applications.

103.   Ygrene has also been aware that there is a significant likelihood that many if not most of its customers would be unable to sell or refinance their homes without first paying off the balance of their PACE loans.  Ygrene has received numerous complaints from consumers who stated they were misled about this fact and consumers who were surprised to learn that Ygrene's PACE financing blocked their ability to sell their property or refinance their mortgage.

104.   Since at least 2015, Ygrene has been aware of the policies of the FHFA and of the policies of many mortgage lenders requiring that consumers pay off Ygrene's PACE financing in full before selling or refinancing their homes.  For example, in November 2015, Ygrene's chief executive officer forwarded to several Ygrene executives a *Wall Street Journal* article headlined "Clean-Energy Loans Make for Messy Home Sales," with the sub-headline, "Home sales and refinances are held up by Fannie and Freddie rules, driving the main lender [a Ygrene competitor] to retool its PACE program."

105.   In March 2016, Ygrene's senior vice president responsible for government affairs expressed concern to other Ygrene executives, including the head of its sales department and its Chief Operating Officer, that Ygrene's Operations team and its Sales team, which included the RAMs, were "not fully/properly trained on several topics, particularly ones that have been constantly evolving (i.e. lien transferability, tax deductibility)."  This internal exchange

occurred in response to a Ygrene customer's complaint.  The customer said that she had been expressly informed by a "Ygrene representative" that using Ygrene financing "would not cause any problems" with her planned refinancing of her home, but "the mortgage company has halted her paperwork because of the lien," and "want[ed] it removed."

106.   A private placement memorandum that Ygrene prepared and caused to be disseminated to investors, dated October 28, 2016, stated the following in a discussion of "Risk Factors": "It is possible that the FHFA's position will make sales of properties that are subject to PACE Assets, or the refinancing of mortgages on such properties, more difficult.  As a result, owners of such properties may be forced to prepay their Special Tax Liens or PACE Assessments in order to complete a sale or a refinancing of their properties."

107.   A set of talking points that Ygrene used internally to train newly hired employees as of December 2017 further demonstrates that Ygrene knew that consumers were being told that the PACE loan would transfer and knew that this issue was confusing.  These talking points included the following question among "Common Property Owner Questions":

> "What do you mean, lenders require full repayment? I was
> told it would transfer."

In the response that Ygrene provided to its employees to use in responding to this commonly asked question, Ygrene admitted that "This part can be a little confusing, I understand!"

108.   In addition, the decisions of various government entities to halt their PACE programs also put Ygrene on notice of consumer-protection problems with its PACE financing.  Various local government entities that authorized residential PACE financing programs and had contracts with Ygrene decided to terminate their programs based, in whole or in part, on concerns that PACE financing lacked adequate consumer protections and/or concerns that consumers had been subject to

deceptive and other unethical practices in the sale of residential PACE financing. In California, the local government entities that terminated their residential PACE financing programs amidst consumer protection concerns include Kern County in July 2017, Bakersfield in July 2017, Calaveras County in January 2018, and Los Angeles County in May 2020. In Florida, the entities that terminated their residential PACE financing programs include Collier County in May 2019, Hernando County in May 2020, and Hillsborough County in August 2020.

109. For example, when Kern County terminated its residential PACE financing program in July 2017, the Kern County Board of Supervisors resolved, after a public hearing at which testimony and evidence were adduced, that "the evidence indicated that some program participants had been misled about the nature and impact of the program, that the lien placed on the property made it difficult, if not impossible, to sell the property," and that the financing "posed an obstacle to refinancing the property and that elderly residents were particularly vulnerable to exploitation in the program." Kern Cnty., Cal. Resolution No. 2017-189 (2017). Similarly, the Bakersfield City Council declared "a significant body of evidence . . . has displayed negative consequences in Bakersfield as a result of PACE loans including instances where residents did not know a bill was going on their taxes, . . . disruptions to real estate transactions, . . . and other adverse impacts." Bakersfield, Cal. Resolution No. 107-17 (2017). More recently, when Los Angeles County terminated its PACE program in May 2020, the County issued a statement that, despite "the implementation of stronger consumer protection practices" in response to "increasing criticism and concern," "the County cannot be certain these measures will provide sufficient protection for all consumers." County of Los Angeles, *Los Angeles County PACE, Residential PACE Program*, available at http://pace.lacounty.gov/ (last visited Sept. 7, 2022).

## Ongoing Nature of Defendant's Unlawful Practices

110. Based on the facts and violations of law alleged in this Complaint,

Plaintiffs have reason to believe that Ygrene is violating or is about to violate laws enforced by the FTC and California because, among other things:

- Ygrene engaged in unlawful acts and practices repeatedly over a period of several years;
- Ygrene engaged in deceptive and unfair acts and practices even though Ygrene knew or should have known that its practices were deceptive and unfair;
- to the extent that Ygrene made changes to its disclosure practices, the majority of Ygrene's changes were made only in response to litigation or government investigations; and
- Ygrene remains in the residential PACE loan administration business and maintains the means, ability, and incentive to continue or resume its unlawful conduct.

Additionally, the injury and violations of law caused by Ygrene's previous unlawful acts and practices are ongoing, as these have caused consumers to continue to be subject to ongoing property liens and payment obligations.

## VIOLATIONS OF THE FTC ACT

111.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

112.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

113.   Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

### Count I

### False, Misleading, or Unsubstantiated Home Sale and Refinancing Claims

114.   In numerous instances, in connection with the advertising, marketing,

-31-

promotion, offering for sale, or sale of residential PACE financing, Defendant has represented to consumers, directly or indirectly, expressly or by implication, that

    a.    upon sale of their homes, consumers with PACE loans from Defendant would be able to simply transfer the lien or any outstanding balance on the PACE loan to the new owner and would not have to first pay off the remaining balance of the PACE loan; and

    b.    Defendant's PACE financing would not create any obstacles to, or interfere with, consumers' ability to sell or refinance their homes.

115.   In truth and in fact, in numerous instances in which Defendant has made the representations set forth in Paragraph 114 of this Complaint, such representations were false or not substantiated at the time the representation was made.

116.   Therefore, the representations as set forth in Paragraph 114 are false or misleading or were not substantiated at the time the representations were made and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II

### Unfair Use of Consumers' Homes to Secure Ygrene's Loan

117.   In numerous instances, in connection with the sale of PACE loans, Defendant has caused a consumer's home to be used as collateral to secure the PACE loan without having obtained the consumer's express, informed consent.

118.   Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

119.   Therefore, Defendant's acts or practices as set forth in Paragraph 117 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### VIOLATIONS OF REGULATION N

120.   In July 2011, the FTC issued the MAP Rule, which became effective on August 19, 2011, and which prohibited deceptive claims in the advertising, marketing, and sale of "any mortgage credit product."  The MAP Rule was subsequently recodified as Regulation N, 12 C.F.R. Part 1014, which became effective December 30, 2011 as an Interim Final Rule, and as a Final Rule on April 28, 2016.

121.   Regulation N defines "mortgage credit product" as "any form of credit that is secured by real property or a dwelling and that is offered or extended to a consumer primarily for personal, family, or household purposes."  12 C.F.R. § 1014.2.

122.   Regulation N defines "commercial communication" as "any written or oral statement, illustration, or depiction, whether in English or any other language, that is designed to effect a sale or create interest in purchasing goods or services, whether it appears on or in a label, package, package insert, radio, television, cable television, brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, film, slide, audio program transmitted over a telephone system, telemarketing script, on-hold script, upsell script, training materials provided to telemarketing firms, program-length commercial ('infomercial'), the internet, cellular network, or any other medium.  Promotional materials and items and Web pages are included in the term *commercial communication*."  12 C.F.R. § 1014.2.

123.   Regulation N defines a "person" as "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity."  12 C.F.R. §1014.2.

124.   Regulation N defines "term" as "any of the fees, costs, obligations, or characteristics of or associated with the product.  It also includes any of the conditions on or related to the availability of the product."  12 C.F.R. § 1014.2.

125.   Pursuant to the Omnibus Act, § 626, 123 Stat. at 678, as clarified by the Credit Card Act, § 511, 123 Stat. at 1763–64 and amended by the Dodd-Frank Act, § 1097, 124 Stat. at 2102–03, 12 U.S.C. § 5538, and pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of Regulation N constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

126.   Regulation N prohibits any person from "mak[ing] any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product."  12 C.F.R. § 1014.3. Prohibited misrepresentations include, but are not limited to, "misrepresentations about . . . [t]he consumer's ability or likelihood to obtain any mortgage credit product or term."  12 C.F.R. § 1014.3(q).  Prohibited misrepresentations also include, but are not limited to, "misrepresentations about . . . [t]he consumer's ability or likelihood to obtain a refinancing or modification of any mortgage credit product or term."  12 C.F.R. § 1014.3(r).

## Count III

## Misrepresentations Regarding the Terms of a Mortgage Credit Product

127.   In numerous instances, in commercial communications regarding the terms of its residential PACE financing, which is a "mortgage credit product," Defendant has represented, directly or indirectly, expressly or by implication, that

 a.   upon sale, consumers with PACE loans from Defendant would be able to simply transfer the lien or any outstanding balance on

the PACE loan to the new owner and would not have to first

pay off the remaining balance of the PACE loan; and

b.     Defendant's PACE financing would not create any obstacles to, or interfere with, consumers' ability to sell or refinance their homes.

128.   In truth and in fact, in numerous instances in which Defendant has made or caused to be made the commercial communications set forth in Paragraph 127 of this Complaint, such commercial communications materially misrepresented these terms of Defendant's mortgage credit products.

129.   Therefore, Defendant's representations as set forth in Paragraph 127 constitute material misrepresentations regarding a term of a mortgage credit product in violation of Regulation N, 12 C.F.R. § 1014.3, 1014.3(q), and 1014.3(r).

## VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW
### Count IV

130.   Ygrene has violated, and continues to violate, Business and Professions Code section 17500 *et seq.* by making or disseminating, or causing to be made or disseminated, false or misleading statements with the intent to induce members of the public to use Ygrene PACE financing when Ygrene knew, or by the exercise of reasonable care should have known, that the statements were false or misleading.  The false or misleading statements include, but are not limited to, the following:

a.     Misrepresenting that upon sale of their homes, consumers with PACE loans from Defendant would be able to simply transfer the lien or any outstanding balance on the PACE loan to the new owner and would not have to first pay off the remaining balance of the PACE loan; and

-35-

      b.      Misrepresenting that Defendant's PACE financing would not create any obstacles to, or interfere with, consumers' ability to sell or refinance their homes.

## VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

### Count V

131.    Ygrene has engaged in, and continues to engage in, acts or practices that constitute unfair competition as defined in Business and Professions Code section 17200. These acts or practices include, but are not limited to, the following:

      a.      Engaging in deceptive marketing, including regarding consumers' ability to sell or refinance a property that is encumbered with a PACE lien;

      b.      Causing consumers' homes to be used as collateral to secure PACE loans without having obtained the consumers' express, informed consent;

      c.      Violating the FTC Act, as described in Paragraphs 114 to 119;

      d.      Violating Regulation N, as described in Paragraphs 127 to 129; and

      e.      Violating Business and Professions Code section 17500 *et seq.*, as described in Paragraph 130.

### CONSUMER INJURY

132.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Ygrene's violations of the FTC Act, Regulation N, California's Unfair Competition Law, and California's False Advertising Law. Absent injunctive relief by this Court, Ygrene is likely to continue to injure consumers and harm the public interest.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

1     A.    Enter a permanent injunction to prevent future violations of the FTC

2 Act, Regulation N, California's Unfair Competition Law, and California's False

3 Advertising Law by Defendant;

4     B.    Award monetary and other relief within the Court's power to grant;

5     C.    Award Plaintiff California monetary civil penalties from Defendant

6 for each violation of California's Unfair Competition Law and California's Unfair

7 False Advertising Law alleged in this Complaint; and

8     D.    Award any additional relief as the Court determines to be just and

9 proper.

Respectfully submitted,

Dated: October 28, 2022

ROBERT J. QUIGLEY
JOHN D. JACOBS
KARINA A. LAYUGAN
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4300

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

-37-

1

2

3

4

5   Dated: _Oct. 25_, 2022

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROB BONTA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General

_Laurel Carnes_

RACHEL A. FOODMAN
LAUREL M. CARNES
MICHELE VAN GELDEREN
California Department of Justice
1515 Clay Street, Suite 2000
Oakland, CA 94612
(510) 879-1300

Attorneys for Plaintiff
PEOPLE OF THE STATE OF
CALIFORNIA

-38-